[No. 15952.  Department Two.  January 26, 1921.]

E. E. MAYER, *Respondent,* v. C. C. GIBSON,
*as Treasurer of Lincoln County, Appellant.*[1]

SALES (85)—OPERATION AND EFFECT—TRANSFER OF TITLE—INTENT.
Under the rule that the intent governs the passing of title, a
definite quantity of wheat passed to the buyer January 20, at the
time the contract was made and the price paid, although the con-
tract provided that it was to be delivered f. o. b. cars at D. to be
forwarded before April 1, where the wheat, part of a quantity of
uniform quality sacked and stored in a warehouse, was inspected
and insurance policies thereon immediately assigned to the buyer.

Appeal from a judgment of the superior court for
Lincoln county, Truax, J., entered January 7, 1920, in
favor of the plaintiff, in an action to remove a cloud
upon title to land subjected to a tax lien.  Reversed.

*M. E. Jesseph,* for appellant.

*D. R. Glasgow,* for respondent.

MITCHELL, J.—As of the date of March 1, 1917,
twenty-five thousand bushels of wheat were assessed
in Lincoln county as the property of E. E. Mayer.
The taxes levied thereon not having been paid, the
county treasurer in due time selected certain land
owned by Mayer and charged it therewith.  There-
after, claiming he was not the owner of the wheat on
March 1, 1917, he brought this action to have the cloud
on the title to the land by the tax lien removed, and to
enjoin the county treasurer from selling the land in
payment of the tax.  Trial in the superior court re-
sulted in a judgment in favor of the plaintiff.  The
county treasurer as defendant has appealed.

The wheat was raised by George W. Hoffman and
his two sons, E. Hoffman and George E. Hoffman, and
stored by them in their private barn or warehouse at
Davenport.  Mayer and the owners of the wheat were
brought together by John Hoffman, a brother of

[1]Reported in 195 Pac. 1.

George W. Hoffman. On January 19, 1917, George W. Hoffman, at that time in another county, authorized his brother, by telephone, to sell his interest in that amount of wheat; his part of the money, however, was to be placed with E. N. Imus, one of the bankers at Davenport. On the morning of January 20, 1917, Mayer, John Hoffman and George E. Hoffman went to the warehouse, at which time Mayer made an examination of the wheat. This is denied by him, but the proof is against him. It was so testified to by the other two, and Mr. Frazier, at whose office the deal was finally completed, testified that, while they were at his office, one of the parties—he thought it was Mayer—stated that the wheat had been examined by Mayer. The wheat was in sacks and consisted of several hundred sacks more than twenty-five thousand bushels. After examining the wheat, the parties went to the office of J. E. Frazier, an insurance agent, where the trade was completed. Mayer paid $40,000 cash and took an instrument in writing as follows:

"J. E. FRAZIER
"Insurance, Loans, Real Estate.
"Davenport, Washington.

"Received from E. E. Mayer, Spokane, Washington, the sum of forty thousand and no one-hundredths ($40,000) dollars, in full payment of Eight Thousand Four Hundred (8400) bushels Bart Wheat, and Sixteen Thousand Six Hundred (16,600) bushels of Bluestem Wheat now in the Geo. W. Hoffman grain warehouse on railroad of the Washington Central Branch of the Northern Pacific Railroad at Davenport, Washington, to be delivered to said E. E. Mayer, f. o. b. cars, Davenport, Washington, whenever the said E.. E. Mayer furnishes cars before April 1st, 1917.

"Dated at Davenport, Washington, this 20th day of January, 1917. (Signed) George W. Hoffman,
"By E. N. Imus,
"E. Hoffman,
"George E. Hoffman."

The Hoffmans had insurance on the wheat which was immediately transferred, upon demand of Mayer, to himself as owner of the wheat. George W. Hoffman being absent, his insurance was canceled and in its stead a new policy issued to Mayer, while the other two Hoffmans, it seems, assigned their policies of insurance to him. In moving the wheat, the respondent procured the cars and had them spotted on the track by the warehouse, whereupon the wheat was weighed and transferred by him and the Hoffmans from the warehouse to the cars. The first two car loads were taken on February 8, 1917. The proof is silent as to where the two car loads were taken. The balance of the wheat was moved during the month of March, 1917.

The respondent testified that, in loading the wheat, he inspected it to see if it came up to the standard of number one wheat that it was represented to be at the time of his purchase, and that he found a substantial quantity which he refused to accept. On the contrary, and more convincingly that way, the proof shows that the wheat was of splendid quality, that it was sold without reference to grades, and all of those who helped load the cars, other than the respondent, that were witnesses at the trial testified that, while respondent at the last probably said something about the quality of some of the wheat, as a matter of fact he did not refuse to take a single sack of it as it was taken down, weighed and removed from the warehouse; and further, the uncontradicted testimony is that the wheat left in the warehouse consisting of several hundred sacks for seed purposes was of the same kind, character and value as that taken by the respondent, and a part of the same general pile that practically filled the warehouse.

Upon the question if title to the wheat passed on January 20, 1917, respondent places undue importance on the wording of the contract which calls for a certain number of bushels of wheat of one name and a given quantity of another name, from which it is argued that the necessity for segregation negatives the idea of a present sale and the consequent passing of title. If otherwise forceful, the argument is wholly deprived of merit by respondent's own testimony, for, in answer to questions by his counsel, he said:

"Q. Mr. Mayer, is that the correct proportion of the wheat as delivered, 16,600 bushels of Bluestem and 8,400 bushels of Bart; is that the way it was delivered to you?

"A. No, not quite. They gave me all of the Bart wheat they had, I think. It was—it made a difference, anyway; there was more of one kind than there was of another.

"Q. Not enough to make any difference to you?

"A. Well, it didn't make any difference to me because it was correct, the same anyway; one was worth just as much as the other, so I didn't care for that. But, of course, I kept it separate because it was sold separate, but there was more of one kind than what the ticket or contract called for, and less of another."

The answer to the controversy must be reached by ascertaining the intention of the parties. It is to be discovered not by some expressed afterthought or conclusion on the part of the respondent, but from the terms and conditions of the contract and the circumstances surrounding and attending the sale. The price was paid. Nothing remained to be ascertained or adjusted, to conclude what the rights of the parties were. The wheat had been examined by the respondent and left at the vendors' warehouse for respondent's convenience. He was entitled to immediate delivery of the property if he so desired. The total mass from

which quantity alone was to be separated, was identical in quality and uniform in value, so that the privilege of selection would not confer any advantage upon either party. A similar situation is tersely described and disposed of by the court of errors and appeals of New Jersey in a well-reasoned case upon this subject, viz.: *Hurff v. Hires,* 40 N. J. L. 581, 29 Am. Rep. 282, as follows:

"Nothing was left undone by the parties, except measuring out the quantity purchased from any part of the whole bulk—a ministerial act which might be done by either party, or by any stranger, as well as by the parties themselves."

The case of *O'Keefe v. Leistikow.* 14 N. D. 355, 104 N. W. 515, involved the sale of seventy bushels of flax not separated from a mass containing eighty-five one-half bushels by measurement and seventy-four bushels by weight. The question in the case was, "Was a separation from the mass, or the measuring of the seventy bushels, a condition precedent to the passing of the title to the defendant?" Deciding the question, the court said:

"It seems to be generally held that, if the property sold is mixed with other property not like in quality or size and a certain grade or quality only is sold, then the separation and selection is presumptively a condition precedent to the passing of title. It is also held in many cases that, if there must be measuring or selecting of certain kinds of property from a mass before the price can be ascertained, then no title presumptively passes. These rules are always subject to the intention of the parties. In this case the property was identified and ascertained. The subject-matter of the contract was specified as seventy bushels of flax on the Ops farm. The price was fixed. Delivery was not dependent on the payment of the price, but prepayment waived. Nothing was undetermined, or dependent upon measuring or weighing of the flax. The

mere fact that the seventy bushels were mingled with other flax is not of controlling importance, unless something was to depend upon the measuring. The evidence shows an intent to pass the title at once. There is nothing in the record to negative an intention on the part of the seller to part with the property, nor on the part of the buyer to accept it at once. The buyer and seller became tenants in common of the flax, each having the right to take his share therefrom. The following cases are in point on this question: Mechem on Sales, sec. 516; *Hurff v. Hires,* 40 N. J. Law, 581, 29 Am. Rep. 282; *Mackellar v. Pillsbury,* 48 Minn. 396, 51 N. W. 222; *Nash v. Brewster,* 39 Minn. 530, 41 N. W. 105, 2 L. R. A. 409; *Kimberley v. Patchin,* 19 N. Y. 330, 75 Am. Dec. 334; *Chapman v. Shepard,* 39 Conn. 413; *Hoffman v. King,* 58 Wis. 314, 17 N. W. 136; *Young v. Miles,* 20 Wis. 615; *Newhall v. Langdon,* 39 Ohio St. 87, 48 Am. Rep. 426; *Howell v. Pugh,* 27 Kan. 702; *Riddle v. Varnum,* 20 Pick. 280; *Straus v. Minzesheimer,* 78 Ill. 492; *Crofoot v. Bennett,* 2 N. Y. 258; *Welch v. Spies,* 103 Iowa, 389, 72 N. W. 548; *Waldron v. Chase,* 37 Me. 414, 59 Am. Dec. 56.''

To the same effect is the case of *Nash v. Brewster,* 39 Minn. 530, 41 N. W. 105, 2 L. R. A. 409. It considers the question of preference between the payee of a seed-grain note and the lien of the lessor of premises upon which a crop of grain had been grown. The decision was in favor of the holder of the note. It was said:

''It is claimed that the seed was not furnished until after the execution of the note, because the 200 bushels therein described were a part of a larger quantity stored in the same bin, and was not separated or hauled away at the time. It is held in *Kelly v. Seely,* 27 Minn. 388, 7 N. W. Rep. 821, that the contract must be executed, and the sale completed, at the time the note is given. We have no doubt that upon the evidence, and for the purposes of the contract, the sale in this case must be deemed completed at the time of the execution of the note, and that, as between the

parties, at least, the title passed. The transaction appears to have been *bona fide,* and the evidence, which was uncontradicted, tended to prove that the wheat in the bin, of which the 200 bushels was a part, was all of the same kind, and Lovejoy had the same right to take that amount from the bin, and remove it, as he would if it had been separated. He was given permission to haul it away by the load and the plaintiff was in the meantime to be the bailee of the same. It was unnecessary to put the parties to the extra trouble of handling it twice in the granary, or to remove it all in one day. The evidence was sufficient to warrant the jury in finding that it was the intention of the parties that the title should presently pass, and in such cases it is a question of intention to be gathered from the circumstances. Weighing or measuring is not absolutely essential to a complete sale, except when necessary in order to define the subject-matter. *Winslow v. Leonard,* 24 Pa. St. 14. It might be more conclusive or satisfactory, but, if the evidence was sufficient to show the intention of the parties, and the vendee had the absolute right to take away the amount sold at the time, it is sufficient. *Burrows v. Whitaker,* 71 N. Y. 291; *Hatch v. Oil Co.,* 100 U. S. 124. Accordingly, though the authorities are not uniform, we think the rule is quite well established that, upon a sale of a specific quantity of grain, its separation from a mass, indistinguishable as to kind, quality, or value, of which it is a part, is not necessary to pass the title, where the intention to do so is otherwise made manifest. *Kimberly v. Patchin,* 19 N. Y. 330; *Russell v. Carrington,* 42 N. Y. 118; *Lobdell v. Stowell,* 51 N. Y. 70; *Chapman v. Shepard,* 39 Conn. 413; *Hurff v. Hires,* 40 N. J. Law, 581-586; 6 Amer. Law Rev. 450-458; 2 Schouler, Pers. Prop. § 258; 1 Benj. Sales, (Corbin's Notes,) § 395, etc. It was competent for the parties to make themselves tenants in common of the wheat in a particular bin by the sale of a part, and in such case the plaintiff might sever and take his own at any time. His legal rights were as well defined and complete as if his portion had been measured out and placed in a separate bin on plaintiff's premises, and in his care.''

Other authorities to the same effect are *Seldomridge v. Farmers' & Merchants' Bank*, 87 Neb. 531, 127 N. W. 871, 130 N. W. 848, 30 L. R. A. (N. S.) 337; 24 R. C. L. 29, § 291; 35 Cyc. pp. 279, 336; Mechem, Sales, § 483.

The conclusion is the title to the wheat passed to the respondent on January 20, 1917, and that it was properly assessed as belonging to him. There is nothing in the record that fairly negatives this conclusion.

Judgment reversed.

HOLCOMB, MOUNT, MAIN, and TOLMAN, JJ., concur.